**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **United States of America ex rel.** ) | |
| **ANTHONY MERTZ,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **vs.** ) | **Case No. 12 C 4174** |
| ) | |
| **MARCUS HARDY, Warden,** ) | |
| **Stateville Correctional Center,** ) | |
| ) | |
| **Respondent.** ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

In February 2003, an Illinois jury convicted Anthony Mertz of first-degree murder,

aggravated criminal sexual assault, and two counts of home invasion in connection with

the death of Shannon McNamara. He was sentenced to death for the murder and a

prison term of sixty years for the home invasion. In March 2011, Governor Patrick

Quinn commuted Mertz's death sentence to a sentence of life imprisonment without the

possibility of parole. Mertz has petitioned this Court for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254. For the reasons stated below, the Court denies Mertz's

petition.

**Background**

**A.    State court proceedings**

**1.    The trial and sentencing**

On June 12, 2001, Carissa Brooks found her roommate, Shannon McNamara,

dead on the floor of their apartment on Fourth Street in Charleston, Illinois. She testified

that after finding McNamara, she immediately went to a neighbor's apartment to call the police.

Officer Ronald DeLude responded to the 911 call. He testified that he arrived at McNamara's apartment at approximately 9 a.m. on June 12. DeLude stated that when he entered McNamara's apartment, he found her lying on her back approximately six feet from the door, nude except for a T-shirt and bra that had been pulled over her face. According to DeLude, McNamara had "a very large gaping wound on her abdomen," and it was "obvious that she was deceased." Ex. C at 1843. DeLude searched the apartment and found a window on the south side of the apartment open with the screen cut.

Dr. Travis Hindman, a forensic pathologist, performed an autopsy on McNamara. He testified that McNamara died primarily due to asphyxia from choking on a wash rag that had been forced into her mouth. Dr. Hindman explained that the wash rag was so "tightly packed" into McNamara's mouth that he had to forcibly remove it. *Id.* at 1931. Dr. Hindman testified that other injuries also contributed to her death, including manual strangulation, a large stab wound to McNamara's abdomen, and injuries resulting from a large laceration of her liver. Dr. Hindman, whom the trial court qualified as an expert witness in the field of forensic pathology, opined that the liver laceration was the result of severe blunt force trauma.

Dr. Hindman testified that McNamara had bruising on her neck, which he opined was most likely the result of her "defensive gestures in trying to provide an airway." *Id.* at 1937. He found that her upper lip was torn, which he concluded was "typical of manual attempts at smothering, by placing a hand over [the] mouth." *Id.* at 1935.

Finally, he observed that her hyoid bone—a bone found high in the neck—was fractured, which he stated was further evidence of manual strangulation.

According to Dr. Hindman, McNamara had several other bruises on her face and body that were most likely from her attacker, as well as several knife wounds. Specifically, Dr. Hindman observed several small cuts on McNamara's face, neck, and right shoulder, a cut running along her genital region, an incision extending from the midline of her back to the bottom of her shoulder blades, and a cut running from her chest to just beneath her navel. He stated that the abdominal incision was so deep that it exposed a portion of her intestines. Finally, Dr. Hindman found several defensive wounds on McNamara's hands.

Richard Caudell, a crime scene investigator for the Illinois State Police, testified via his deposition[1] that he processed the Fourth Street apartment as a crime scene. During his investigation of the scene, Caudell saw the open window with the cut screen. He also noted that McNamara's bedroom looked disheveled, one of her tables was missing a leg, and the mattress had been pulled askew from its box spring against the wall. During his search of the apartment, Caudell found a piece of a latex glove near McNamara's left arm, a razor blade on the floor of her bedroom, an empty box cutter handle on the floor of the hallway, and a Navy Federal Credit Union credit card with the name "Anthony B. Mertz." Ex. D at 49. He also photographed several spots of blood on various items and fixtures throughout the apartment.

Moultrie County Sheriff Deputy Chris Sims testified that he found a large kitchen knife in a dumpster approximately one block from McNamara's apartment with her blood

---

[1] Caudell died prior to Mertz's trial, and thus the prosecution presented his videotaped deposition to the jury rather than calling him as a witness.

on it.  Carissa Brooks testified that the knife was part of a set that she and McNamara owned and kept in the apartment.

Illinois State Police officers Patrick Callaghan and Jeffrey Marlow both testified that they canvassed the neighborhood of McNamara's apartment on the morning of June 12 to look for potential witnesses or suspects.  Callaghan stated that they visited apartments in the building across the street from McNamara's apartment, where Mertz was living at the time.  After tenants from one of the apartments mentioned Mertz as a possible suspect, the police found Mertz in his neighbor Bryan Beavers's apartment, wrapped in a sheet on the floor.  Marlow testified that he shook Mertz, who was "not fully awake or coherent at the time."  Ex. C at 2528.  He asked whether Mertz had seen or heard anything during the previous night, and Mertz replied that he had been drinking all night.

Callaghan and Marlow left Beavers's apartment, but they tracked Mertz down later that evening after learning that his credit card had been found in McNamara's apartment.  The police brought him to the local police station for an interview. Callaghan testified that Mertz told them that he had been drinking with Beavers at Beavers's apartment the night before, and that "his last recollection of that night . . . was he was watching a Bat Man cartoon on DVD [at] about 2 a.m. in Mr. Beavers'[s] apartment."  *Id.* at 2499.  Callaghan noticed that Mertz had "some minor cuts and abrasions," and he testified that when he asked Mertz about the injuries, Mertz "[m]entioned something" about a broken shot glass.  *Id.* at 2512–13.  Marlow testified that Mertz denied knowing McNamara or ever visiting her apartment, although he admitted visiting other apartments in the building.  According to Marlow, at one point

4

Mertz admitted that he had recently watched McNamara sunbathing outside of her apartment.

Later that evening, police obtained a search warrant for Mertz's blood, hair, and fingerprints. Jennifer Lu, a forensic scientist with the Illinois State Police, testified that she tested DNA from underneath McNamara's fingernails against DNA samples from both Mertz and Beavers. Although she was able to exclude Beavers as a DNA match, she concluded based on the testing that Mertz could not be excluded as a possible match. Lu testified about the frequency of the DNA found under McNamara's fingernails, stating that it occurred in approximately one in 29 billion black individuals, one in 1.8 billion white individuals, and 1.1 billion Hispanic individuals. Lu admitted on cross-examination that some other DNA that was collected from McNamara's body contained a mixture of three different people's DNA and that police never identified a third person to whom the DNA might belong.

Police also obtained a search warrant for both Mertz's and Beavers's apartments. Officer Kevin Paddock from the Charleston Police Department testified that police searched Mertz's apartment at approximately 9 p.m. on June 12 and confiscated his computer and a bag containing some rubber gloves. Paddock admitted, however, that the gloves were never compared against the portion of the latex glove found in McNamara's apartment. Paddock also admitted that the police did not find or confiscate any clothes that appeared to have blood on them. A simultaneous search of Beavers's apartment similarly failed to yield any bloody clothing.

Illinois State Police Officer Michael Bernardini testified that he interviewed Mertz again at approximately midnight on June 12. Mertz agreed to undress and be

photographed, at which point Bernardini noticed that Mertz had "minor scratches and abrasions and some bruising on different areas of his body." *Id.* at 2211. Mertz again denied meeting McNamara or ever entering her apartment, but he offered no alibi regarding his whereabouts on the evening of June 11. Bernardini testified that during the course of the interview, Mertz became increasingly "emotional, teary-eyed, [and] asked [him] the question of . . . why aren't I under arrest for this yet?" *Id.* at 2216. The interview concluded, and Mertz was arrested shortly thereafter.

Mertz shared a jail cell with Mark Stabler immediately after his arrest. Stabler, who had recently been arrested for manufacturing methamphetamine, testified at Mertz's trial that he asked Mertz, "did you choke her or something," and that Mertz replied, "something to that effect, yeah." *Id.* at 2436. On cross-examination, Stabler admitted that although he was originally charged with two counts of manufacturing methamphetamine, he was only convicted of one. He also admitted that he had previously testified against a criminal defendant in exchange for immunity. Stabler testified on redirect that he did not receive anything in exchange for his testimony against Mertz.

Finally, the prosecution called Michael Jordan, who had also shared a cell with Mertz while Mertz was awaiting trial, from January to March 2002. Jordan stated that he had been arrested for, and subsequently pled guilty to, a felony robbery charge, and he admitted that he had previously been convicted for burglary three separate times. According to Jordan, Mertz admitted to him that he had tried to break into McNamara's apartment on June 12 through the front door and that when that did not work, he split a window screen with a box cutter. Mertz explained that "[h]e slit the screen because it

was quiet and it was an easy way to get in." *Id.* at 2472–73. Jordan said that he and Mertz discussed the fact that they both wore gloves during the commission of their crimes and that Mertz told him that his gloves had torn "[d]uring the struggle between him and Shannon McNamara." *Id.* at 2473. Mertz told Jordan that when he first came into the apartment, McNamara began to scream, so Mertz "tried to shut her up by choking her." *Id.* at 2474. According to Jordan, McNamara died, and Mertz "wanted to make it look like somebody else had done it. . . . He told me her ex-boyfriend or boyfriend or somebody said they were having problems and that he basically wanted it to look like it was a crime of passion." *Id.* at 2474–75.

In his defense, Mertz called Clifford Baugh, who testified that while he was incarcerated with Mark Stabler, Stabler admitted to him that he planned to fabricate testimony against Mertz in exchange for a reduced sentence of incarceration. Specifically, Baugh testified that Mertz did not actually admit any involvement in McNamara's murder but that Stabler had used news articles about the murder to find details about the case. Baugh further testified that Michael Jordan also fabricated his testimony against Mertz. According to Baugh, Jordan approached him and told Baugh that if he testified against Mertz, he could get a "time cut, too." *Id.* at 2824. Baugh admitted during cross-examination that he had previous convictions for theft and receipt of stolen property, as well as two previous convictions for burglary. He also admitted that he was currently serving a sentence of incarceration after pleading guilty to multiple counts forgery and burglary.

Mertz also called as a witness Tara Hofer, his former girlfriend off and on from approximately September 1998 until June 2001. Hofer testified that a few days before

the murder, she spent the night with Mertz, and they engaged in consensual sex. According to Hofer, when she woke up the next morning, she noticed that Mertz had rug burns on his knees that had not been there the night before. She testified during cross-examination, however, that she did not recall whether she ever told the police about the rug burns on Mertz's knees and how he obtained them. Hofer testified that "[t]he police tried to get me to say that [Mertz] had problem with women and that he was violent." *Id.* at 2906. She admitted, however, that in 1999, Mertz came home drunk one night, pulled her hair, threatened to kill her, and "placed his forearm across [her] throat and choked [her.]" *Id.* at 2910. During redirect, Hofer stated that the police report documenting her statement about that encounter was not entirely accurate, although she did not state which specific portions were untrue.

Finally, Mertz called Jack Smith, a licensed private investigator whom he had hired to aid in his defense. Smith testified that he found a broken shot glass in a trash can in Mertz's apartment. According to Smith, he asked the police to preserve the shot glass, but they refused and would not allow Smith to take the broken glass out of the apartment.

On February 12, 2003, the jury found Mertz guilty of home invasion, aggravated criminal sexual assault, and first-degree murder. The jury also determined that Mertz was eligible for the death penalty because he had committed the murder in the course of committing other felonies—namely, aggravated criminal sexual assault and home invasion.

At the sentencing phase of Mertz's trial, the prosecution called a number of witnesses to testify about Mertz's past history of violence, as well as threats and violent

incidents involving him that occurred while he was in jail awaiting trial.

The prosecution called Randi Morris, who testified that she briefly dated Mertz in the spring of 2001. Morris testified that on May 25, 2001, she and Mertz went out with a group of friends to a local bar and eventually ended up at Mertz's apartment, where Mertz and a few other friends continued drinking. According to Morris, Mertz began to wrestle with a female friend of his and at one point threw her onto the table so hard that the table broke. At some point, the others in the group left, leaving Mertz and Morris alone in the apartment. The two engaged in foreplay and undressed. According to Morris, she realized that Mertz intended to penetrate her anally, and she told him, "no, don't do that" and tried to get away. Ex. E at 3485. Morris testified that Mertz penetrated her and that when she screamed and kicked to get away, "he put his hand over [her] mouth and shoved his fingers up so that they covered [her] nose so [she] couldn't breathe." *Id.* Morris testified that while Mertz was still lying on top of her, he began to jerk her head back and forth violently, causing her neck to crack. At one point, Mertz jerked her head to the side so violently that Morris flipped over onto her back. Morris stated that when she looked into his face, "his eyes were just dark circles and his mouth was pursed, his lips were pursed like he was gritting his teeth with his mouth closed." *Id.* at 3488. Morris called Mertz by his name and begged him not to kill her, at which point he went limp and relaxed his hold on her.

After she was able to get off of the bed, Morris testified that she went into the bathroom to clean herself and get dressed. When she returned, however, Mertz refused to let her leave. According to Morris, Mertz forced her to lie down on the floor with him. Once she heard him snoring, Morris ran out of the apartment. She got into

her car, but Mertz followed her and tried to prevent her from leaving.  After a brief struggle, Mertz managed to get into Morris's car through the back seat and refused to leave.  Morris drove to her apartment, and when they arrived, Mertz followed her into the apartment and again forced her to lie down with him in her bed.  When he fell asleep, Morris left her apartment to go to work.  When she returned home later that day, Mertz was gone.  Morris stated that she stopped seeing Mertz after that day and refused to be alone with him, although she did see him in group settings.  She testified that she did not report the incident to police "[b]ecause [she] was afraid."  *Id.* at 3497. On cross-examination, Morris testified that she had never seen Mertz drink heavily before but that he was drinking heavily on May 25, 2001 and had also smoked marijuana.

The prosecution next called Keri Guillory, whose boyfriend had been in the Marine Corps with Mertz and had become friends with him.  Guillory testified that in late December 2000, Mertz visited her boyfriend and stayed at their apartment in Louisiana. According to Guillory, Mertz had previously visited them with his then-girlfriend, Tara Hofer.  Guillory testified that Mertz "would drink and he would get really drunk, he would get really mean."  *Id.* at 3519.  According to Guillory, when he arrived in 2000, Mertz was constantly drunk and frequently fighting, including one episode where Mertz "kidney punched [Guillory] twice" in a bar.   *Id.* at 3522.

One night while Guillory's boyfriend was at work, she brought Mertz to a family friend's house.  According to Guillory, Mertz got very drunk, and when they returned later that evening, he fell and split his eye open.  She tried to help him clean his eye, but he pushed her away and tackled her onto the kitchen floor.  Guillory testified that Mertz

held her down while he forced his entire hand into her mouth, scratching the inside of her gums and the back of her throat in the process. *Id.* at 3525. Guillory testified that she escaped from Mertz's hold and ran to her neighbor's house, where she called the police. According to Guillory, she agreed to drop the charges only after her boyfriend agreed that she would never have to see Mertz again.

Officer Jeffrey Marlow, who had previously testified during the guilt phase of Mertz's trial, testified during the sentencing phase that he and another police officer met with Darsann Barker on February 4, 2002 to interview her about a sexual assault that occurred in April 1996. Marlow testified that Barker told him that she had met Mertz in Tijuana while he was stationed with the Marine Corps in San Diego. They began dating and eventually had consensual sex in March 2001. Barker reported that the sex was very rough, although she told Marlow that Mertz did not hit her. Barker told Marlow that on April 22, 1996, Mertz asked Barker to visit him at the camp where he was stationed. When she arrived, he asked her to go into the bedroom. According to Marlow, Barker reported that Mertz put a blanket onto the floor and forced her down onto the floor. Barker stated that Mertz forcibly removed her tampon and raped her. When he finished, Mertz got up and rejoined his friends in the other room. Barker reported the assault to the authorities at the camp, but she did not seek to have criminal charges filed against Mertz for the assault. On cross-examination, Marlow admitted that although the camp had written reports indicating that Barker reported the assault, authorities there declined to prosecute Mertz for the incident.

Kristi DeWitt testified that in December 1997, Mertz came to her home looking for her husband, who was working as a police officer at the time. She told Mertz that he

would not be able to speak with her husband until he was on duty later that day.  Mertz became agitated, and DeWitt eventually asked him to leave.  According to DeWitt, at that point, Mertz "stepped towards me, I guess aggressively."  *Id.* at 3330.  DeWitt told Mertz that if he did not leave immediately, she was going to arrest him for trespassing (she was also a police officer at the time).

The prosecution also introduced evidence that tended to implicate Mertz in the death of another woman, Amy Warner, in June 1999, and the arson of her apartment complex, Unique Apartments, in February 2000.  Warner had been found in her apartment lying partially on her couch, naked from the waist down.  Warner had a deep gash extending across her neck, and Mike Nichols, the coroner for Coles County, testified that Warner's neck wound, along with the resulting loss of blood, caused her death.  The prosecution introduced evidence that at the time Warner was murdered, Mertz lived approximately eight-tenths of a mile from Warner's apartment complex.

Regarding the Warner murder, the prosecution called Bryan Beavers and Doug Paul, two of Mertz's friends, who testified that Mertz had told them he had committed the murder and subsequent arson.  Beavers and Paul both testified during cross-examination, however, that they did not believe Mertz's claims and thought that "he was joking around."  *Id.* at 3345.  Lisle Farnum, who was in the Marine Corps with Mertz, testified that when he visited Mertz in Charleston, he saw an article about "[a] girl . . . who I think got killed in Charleston" hanging on a board above Mertz's computer.  *Id.* at 3351.  Jeremy Deck, who knew Mertz through Mertz's girlfriend, testified that he saw a poster at Mertz's apartment, with a "reward offering information about some girl who was missing in Charleston."  *Id.* at 3359.  Deck testified that when he asked Mertz

about the poster, Mertz told him that "he thought it was rather funny that the reward was only a thousand dollars." *Id.* at 3360.

Patrick Callaghan, who had also testified during the guilt phase of the trial, testified that he had been involved in both the investigation of Warner's murder and the investigation of McNamara's murder. According to Callaghan, he was investigating McNamara's murder when he discovered through a neighborhood resident that Mertz had been at Warner's apartment approximately two weeks before her death. Callaghan explained that Tara Hofer, Mertz's girlfriend, admitted to knowing Warner and told him that the night of Warner's murder, she had gone to bed early and that Mertz had "stayed up late that night." *Id.* at 3692.

The prosecution also called Joe Siefferman, a supervisor with the Illinois State Police, to testify as an expert in the field of crime scene investigation. Siefferman had participated in the investigation of both McNamara's murder and Warner's murder two years earlier. Siefferman compared the crime scenes of the two murders, noting the similarities that he had observed. Specifically, Siefferman noted that both McNamara and Warner had defensive wounds on their hands, both had suffered a large knife wound, both were murdered in their homes, both were attacked while they were sleeping, both were naked from at least the waist down, and neither crime scene revealed identifiable fingerprints. Siefferman also opined that both victims appeared to have been posed after death, placed onto their backs with their arms extended above their heads. Siefferman opined that the location of the blood on Warner's couch where her body was found indicated that her body was moved after her throat was cut— namely, that her attacker turned her body over to expose the neck wound. He testified

that McNamara was similarly moved closer to the door after she suffered the abdominal wound. Siefferman opined that this act of "display" indicated that the attacker was not someone with an emotional tie to the victim, but rather was done by a "killer [who] wanted to see what he had done." *Id.* at 3641.

Siefferman admitted during cross-examination that the two women had died from different causes (McNamara died from strangulation and suffocation, whereas Warner died as a result of her neck injury). He also conceded that McNamara's T-shirt was pulled over her head, but Warner's shirt was not.

Regarding the arson, Anthony Lauletta and Christopher Howard, two of Mertz's neighbors, each testified that Mertz admitted to them that he had committed the arson at the Unique Apartments complex, although they also testified that Mertz told them about the arson "almost in a joking manner." *Id.* at 3401. Lauletta further testified during cross-examination that when Mertz told him about the arson, they had both been drinking. Howard testified that Mertz verbally abused his girlfriend Hofer on a number of occasions and that he had occasionally seen Hofer with red marks on her neck.

The prosecution also called James Wright, a former FBI agent, to testify as an expert in the field of criminal investigation and crime scenes in particular. Wright testified about his experience with the FBI investigating homicides, arson, and rape, with a particular focus on the intersection between those crimes and psychiatry, psychology, and medicine. He stated that the prosecution had contacted him to examine crime scene and autopsy photographs and review police and witness reports to look for similarities between the Warner murder, the Unique Apartments arson, and the McNamara murder. The trial court qualified Wright as an expert over defense

counsel's objection.

Wright opined that McNamara's murder began as an "organized" crime—one that involved planning in selecting a targeting and finding an opportunity to strike—but at some point became a "disorganized" crime—one typically involving a sloppier crime scene that indicates surprise. Wright testified that this was most likely due to various unforeseen events that occurred at some point after Mertz first tried to enter McNamara's apartment via the front door but was unsuccessful. He stated that the crime might also have become more disorganized after McNamara resisted more than Mertz expected. According to Wright, McNamara's liver laceration indicated that Mertz became angry after McNamara resisted, which "rob[bed Mertz] of control" and caused him to react violently in a disorganized manner. *Id.* at 3743. Wright opined that Mertz likely regained his composure when the struggle was over and was more calmly able to dispose of the murder weapon in a dumpster.

Regarding Warner's murder, Wright opined that the crime scene indicated that it was a much more organized crime, likely because Warner put up less resistance than McNamara. He also noted a number of similarities between the two murders, including the fact that both women's arms were extended above their heads and the fact that both women suffered injuries to their neck. Wright further testified that a number of other women who reported being attacked by Mertz also reported having their arms extended over their heads and being threatened or injured at the neck. Regarding the arson, Wright opined that based upon his experience, arsonists experience a "sense of power and control" from setting a fire that they find very appealing. *Id.* at 3747.

Finally, speaking about Mertz generally, Wright opined that he displayed a great

deal of anger toward women and that "he was certainly not very cooperative. He was belligerent." *Id.* at 3748. In response to a question regarding the evidence indicating that Mertz kept news articles on the Warner murder, Wright opined: "certainly most of the serial killers that we have identified and interviewed and serial rapists as well and all violent serial offenders tend to keep newspaper articles and – and other printed material, not only about the crimes they commit but there – similar crimes as well." *Id.* at 3749. Regarding Mertz's alcohol addiction, Wright opined that it was not likely that Mertz would have been able to commit the amount of planning indicated by the crime scene had he committed the crime while in a "drunken stupor . . . ." *Id.* at 3750. Like Siefferman, Wright admitted during cross-examination that there were differences between the two murders, including the fact that McNamara's body had a greater degree of mutilation than Warner's body and the fact that there was no evidence that Warner's attacker had forcibly entered her apartment.

The prosecution also called a number of witnesses to testify about violent incidents involving Mertz that occurred while he was in custody while awaiting trial. First, Michael Jordan, who had previously testified during the guilt phase of the trial, testified that Mertz told him that "if things went bad that he didn't plan on spending the rest of his life in prison." *Id.* at 3306. Jordan stated that he had seen Mertz with a piece of wire that Mertz told him he could use to get out of his handcuffs. Mertz further told Jordan that he planned to get free from his handcuffs, take a gun from one of the jail guards', and escape. According to Jordan, Mertz also told him that he planned to "get even" with a news reporter who had written a news article about him. *Id.* at 3306.

Officer James Rankin testified that in May 2002, he witnessed a fight between

Mertz and another detainee.  When he ordered the two men to stop fighting, the other detainee put his hands up, but Mertz charged him, put him into a head lock, and began punching him in the head.  According to Rankin, Mertz refused to stop punching the other detainee until other officers arrived and forcibly removed him from the area. Officer Terry Tillis testified that Mertz incited a violent outburst in his cellblock, requiring the guards to lock the cellblock down.  When jail staff tried to place another inmate in Mertz's cell shortly thereafter, he refused and told staff that there would be an altercation if they put the other prisoner in his cell.  Officer Adam Rhoads testified that another prisoner at the jail told him that he had gotten into a fight with Mertz after Mertz refused to stop ordering him around and that Mertz had injured him during the fight. Finally, Officer Hillary Spitz testified that in May 2002, Mertz made sexually suggestive comments toward her, and when she responded "over my dead body[,]" he replied, "[t]hat's okay as long as your body's still warm."  *Id.* at 3418–19.

Defense counsel called twenty-five witnesses during the sentencing phase, including Mertz himself.  Counsel elicited testimony about several negative experiences that Mertz suffered during his childhood, including being sexually molested by his stepsister and being abused by his stepmother.  Mertz's sisters testified that they were also sexually molested and abused.  Counsel produced evidence that his family had a history of alcohol dependence and that Mertz took anti-depressant medication.  Mertz's paternal grandmother, Dorothy French, testified that she took custody of Mertz when he was a young child and that she raised him from infancy until he was in the third or fourth grade.  French testified that Mertz attended Sunday school and church regularly and that he continued to attend church even after he moved in with his father.

Counsel elicited testimony that Mertz played football in high school and that he liked to read.  One of Mertz's classmates testified that although Mertz drank frequently, she never saw him angry.  Other classmates and fellow students testified that Mertz continued to attend church even after he left home.

Defense counsel also elicited testimony that Mertz joined the Marine Corps to escape the abuse he suffered at home, just as his sister had done a few years earlier. While he was stationed in California, Mertz sought help for his drinking problem.  He attended Alcoholics Anonymous meetings and stayed sober for three months.  Counsel also introduced evidence that Mertz received an honorable discharge from the Marines and displayed good conduct while he was serving.  A number of witnesses testified about his positive relationships with other Marines.

Counsel also introduced evidence of Mertz's alcohol abuse, including testimony by Mertz himself.  Mertz testified that he had been arrested for drunk driving on four occasions and had been cited for violating a city ordinance when he was found unconscious and nude outside of his apartment building.  Regarding the McNamara murder, Mertz testified that he did not know whether he killed her because he was too drunk, and he admitted that the evidence strongly suggested that he had committed the murder.  One of Mertz's professors at Eastern Illinois University testified that Mertz told her about his drinking problem after she asked him about an assignment that he had failed to submit.  Tara Hofer, Mertz's ex-girlfriend, testified that Mertz's attitude and treatment toward her was entirely dependent upon whether he was drunk or sober. Mertz's friend Brad Adams testified that once after a night of drinking, Mertz had gotten into a fight with a sergeant where they were stationed and had to be restrained.  When

he woke up the next day, however, Mertz did not remember anything about the night.

Two of Mertz's ex-girlfriends testified that he never acted sexually or physically aggressive toward them. They described Mertz as "intelligent, hard working, organized, supportive, caring," *id.* at 4037, and "very affectionate, very cuddly," *id.* at 4046.

On February 26, 2003, the jury determined that there was no mitigating factors sufficient to warrant a sentence less than death and directed the court to give Mertz a death sentence.

## 2. Direct appeal and post-conviction petition

Mertz appealed his conviction and death sentence to the Illinois Supreme Court. He asserted nine claims. These included a claim that the trial court's admission of his political statements, books, tattoos, photographs of former girlfriends, e-mail address, Internet articles, and sexually explicit websites ran afoul of the First Amendment, and a claim that James Wright's opinion testimony about the similarities between the McNamara murder and the Warner murder, the arson, and attacks on other women, and his testimony about Mertz's history and psychology, was unreliable and should not have been admitted. On November 17, 2005, the Illinois Supreme Court affirmed Mertz's conviction and sentence. *People v. Mertz*, 218 Ill. 2d 1, 842 N.E.2d 618 (2005).

Regarding Mertz's First Amendment claim, the court concluded that the evidence at issue was relevant and therefore admissible under *Dawson v. Delaware*, 503 U.S. 159 (1992), and that any of the evidence that was not relevant for the particular purpose for which it was admitted was nevertheless harmless beyond a reasonable doubt. The court explained:

> We first find that all evidence of a sexual nature was properly admitted, including Internet images of women engaging in sexual acts with a dog

and a horse, women in sexually explicit positions, nude children, sexually explicit cartoons, and the articles on date rape. Although the defense presented testimony that other people had access to defendant's computer, and that Tara Hofer was responsible for the date rape articles, defendant admitted that he *had* visited some pornographic sites, without specifying which ones. The images and the articles were found on *defendant's* computer. They were properly admitted, as were the nude photos of defendant's girlfriends. The plausibility of the defense testimony was for the jury to decide, considering it in conjunction with other evidence of defendant's sexual conduct. The relevance of this evidence is obvious.

Evidence of defendant's obsession with sex was properly admitted because both the McNamara and Warner murders had sexual components, there was evidence that defendant had used violence or force in other sexual encounters, and defendant had, in other ways, demeaned and denigrated some of the women with whom he had had relationships. Thus, evidence of this nature bore upon the issue of defendant's future dangerousness. [* * *]

. . .

In this case, defendant's sexual obsession, and its relevance to his future dangerousness, is amply demonstrated by his lewd and morbid sexual overture to a female correctional officer while awaiting trial for Shannon McNamara's murder, a comment suggesting that he would have sex with the officer's dead body. That statement underscores the relevance and extent of defendant's sexual obsession, and shows that defendant is incorrigible and remains a danger to society whether he is drunk or sober, incarcerated or not. We conclude that all evidence bearing upon defendant's sexual obsession was relevant aggravating evidence and was properly admitted.

Similarly, we find no error in the admission of evidence regarding defendant's tattoos and his e-mail address, "Cereal Kilr 2000." As previously mentioned, defendant had two tattoos of the Grim Reaper and another of a cross surrounded by skulls. In light of the overwhelming evidence that defendant brutally murdered Shannon McNamara in June of 2001, the substantial evidence that he had done the same to Amy Warner in June of 1999, the graphic testimony of Randi Morris, which suggested that she too might have met her end at defendant's hands, but for her plea to defendant to spare her life, defendant's statement to her that the Marines had taught him to kill without remorse, and his statement to a university counselor that he would kill others to force the police to kill him, we believe the challenged evidence provides additional, inferential insight into the defendant's state of mind, then, and now. [* * *] Defendant might well consider himself a "serial killer," or the "Grim Reaper," remorselessly

snuffing out life when and where he chooses. The tattoos and e-mail address were thus relevant and sufficiently related to defendant's conduct to pass muster under *Dawson*. It was for the jury to decide whether these were other manifestations of defendant's "poor sense of humor"—like his "joking" statements that he killed Warner, and his "joking" statement that he had burned down an apartment building—or windows into the mind of a serial killer, who was fixated upon violence, death and killing, and who thus represents a continuing threat to those around him.

*Mertz*, 218 Ill. 2d at 63–65, 842 N.E.2d at 652–53. Regarding Mertz's books, the court

determined:

Given the facts of this case, the exclusionary principles of *Dawson* do not apply. We have a "much different case" here. Defendant admitted to friends that he had burned down an apartment building. He effectively endorsed Hitler's extermination of millions of human beings when he told Randi Morris he respected Hitler for trying to "purify his race." On one occasion, defendant shouted a racial epithet at an African–American and provoked a physical confrontation. As previously mentioned, he told Morris the Marines taught him to kill without remorse. The description of defendant's actions in his assaults on women—routinely trying to cut off the victim's air supply or attack the victim's neck—suggests maneuvers learned in military training. In light of this evidence, we believe testimony regarding these books was properly admitted. The defendant's possession of Pipe and Fire Bomb Designs and The Anarchist's Cookbook is sufficiently related to defendant's act of arson to support admission. Defendant's possession of copies of SS: Blood Soaked Soil, Hitler's Enforcers, and Mein Kampf was a proper subject of testimony given defendant's endorsement of genocide, his readiness to hurl provocative racial epithets, and persistent aggressive and violent behavior. Indeed, in light of defendant's aggressive and violent actions, it would be absurd to prohibit a sentencing jury from considering how such beliefs might impact defendant's future dangerousness in a mixed racial prison population. Finally, although we consider defendant's possession of the Marine Corps training manuals of only marginal relevance, we nonetheless believe they *were* relevant and admissible given defendant's assertion that he had been trained in the Marines to be a remorseless killer, and the techniques he employed in assaulting women.

. . .

Finally, we tend to agree with defendant that testimony regarding defendant's alleged sympathies for Timothy McVeigh, and other antigovernment factions, and his opposition to the death penalty was irrelevant and improperly admitted. In our view, those beliefs were not

sufficiently related to relevant considerations in this case.
Notwithstanding, the admission of this evidence, which proportionally
occupies a minuscule part of the trial transcript, was harmless beyond a
reasonable doubt in light of the overwhelming aggravating evidence
against defendant.

*Id.* at 66–69, 842 N.E.2d at 654–55.

Regarding Mertz's objection to the admission of Wright's "profiling" testimony, the

court expressly declined to decide whether profiling testimony is sufficiently reliable to

be admissible at trial.  Instead, it concluded that the admission of Wright's testimony in

Mertz's case was harmless.  Specifically, the court concluded that Wright's testimony

"was, for the most part, cumulative of testimony given by other witnesses, and any

inferences drawn by Wright were commonsense ones that the jurors no doubt had

already drawn for themselves."  *Id.* at 74, 842 N.E.2d at 658.  The court analyzed each

portion of Wright's testimony:

For example, both Joe Siefferman and Patrick Callaghan also testified to
readily observable similarities between the McNamara and Warner
murders.  Siefferman, for instance, testified that both victims appear to
have been posed.  He noted, in each instance, photographs reveal a
victim lying on her back with her arms extended above her head.  In each
instance, the victim was naked from the waist down.  Both were
apparently attacked in their sleep. Both victims sustained injuries from
sharp objects.  In neither instance were identifiable fingerprints found.
Richard Caudell also testified that defendant had posed or displayed
McNamara's body.  Patrick Callaghan testified that he started looking for
connections between defendant and Amy Warner after *he* noted the
similarities between the two murders.  He then learned that Douglas Paul
had indicated that defendant had *admitted* murdering Warner. Indeed, two
people—not counting defendant—eventually testified that defendant had
said he killed Warner; four people eventually testified that defendant had
admitted burning down the building across the street from his apartment.
[* * *]  Given this evidence, Wright's testimony was, in our opinion,
cumulative and essentially superfluous on the issue of the defendant's
commission of the Warner murder and the arson.  Other evidence
sufficiently linked defendant to those offenses.

As far as Wright's "psychiatric or psychological" pronouncements are

concerned, we view them—with no disrespect intended—as observations that anyone off the street would have made when presented with the same evidence.  Defendant complains that Wright was allowed to testify that defendant had "a lot of anger toward women," and that the mutilation of McNamara's body was an expression of anger.  In light of the extensive evidence the jurors heard about defendant's aggressive and disrespectful behavior toward women, and his vicious attacks on multiple women, the jurors could readily ascertain that defendant had "a lot of anger toward women" without Wright's testimony.  Moreover, the jurors undoubtedly divined that a killer who takes the time to mutilate his victim's body is angry or frustrated.  They did not need Wright to tell them that.

. . .

The jurors did not need Wright to draw obvious conclusions for them; yet, for the most part, that is what he did in his testimony.  In sum, we hold the admission of Wright's testimony was harmless beyond a reasonable doubt in that the testimony was cumulative of testimony given by other witnesses, and any inferences drawn by Wright were commonsense ones that the jurors would have already drawn for themselves.

*Id.* at 74–77, 842 N.E.2d at 658–60.

Mertz filed a post-conviction petition, arguing that his trial counsel was constitutionally ineffective on a number of grounds, and that appellate counsel was constitutionally ineffective for failing to argue a particular issue on direct appeal.  On October 9, 2008, the trial court held a hearing on the post-conviction petition.  At the conclusion of the hearing, the court dismissed all of Mertz's ineffective-assistance claims on the ground that any unreasonable performance was harmless.  Mertz appealed the dismissal to the Illinois Supreme Court.  While the parties were briefing Mertz's appeal, Governor Pat Quinn commuted Mertz's sentence from death to a sentence of life imprisonment without the possibility of parole.  Ex. P.

Because the case was no longer a capital case, the Illinois Supreme Court transferred Mertz's appeal to the Illinois Appellate Court.  The state moved to dismiss the appeal as moot based on the governor's commutation.  On July 18, 2011, the

appellate court granted the state's motion and dismissed Mertz's post-conviction appeal as moot.  The court reasoned that because commutation "removes the judicially imposed sentence and replaces it with a lesser, executively imposed sentence," all of Mertz's claims regarding his sentencing hearing "are rendered moot by the Governor's act of commutation."  Ex. T at 3.  The Illinois Supreme Court denied Mertz's petition for leave to appeal.

**B.	Mertz's habeas corpus petition**

In his federal habeas corpus petition, Mertz asserts six claims.  First, Mertz claims that the trial court violated his rights under the First Amendment by admitting evidence regarding his political beliefs, books and articles, tattoos, photographs, and e-mail address.  Mertz next argues that the trial court violated his right to due process under the Fourteenth Amendment when it admitted the profiling testimony of James Wright.  Mertz's remaining claims all involve allegations of ineffective assistance of trial counsel.  Specifically, Mertz contends he received ineffective assistance because trial counsel:  (1) failed to present evidence demonstrating Mertz's intoxication at the time of the crime, which he argues would have provided him with an affirmative defense at the guilt phase of his trial and would have been mitigating evidence at the sentencing phase; (2) failed to investigate and present evidence to challenge the allegation that he murdered Amy Warner; (3) failed to investigate and present evidence to challenge the allegation that he committed the Unique Apartments arson; and (4) failed to object to the admission of Joe Siefferman's profiling testimony.  Mertz also contends that appellate counsel rendered unconstitutionally ineffective assistance by failing to challenge the admission of Siefferman's testimony.

Respondent argues that Mertz procedurally defaulted the portion of his intoxication ineffective-assistance claim regarding the guilt phase of the trial. Respondent argues that Mertz's remaining claims fail on their merits.

## Discussion

A federal court cannot reach the merits of a claim in a habeas corpus petition filed by a state prisoner unless the petitioner has fairly presented the federal claim in state court. *See, e.g., Simpson v. Battaglia*, 458 F.3d 585, 593 (7th Cir. 2006). If a claim is procedurally defaulted – such as by a failure to meet the fair presentment requirement -- a federal court will not address the claim's merits unless the petitioner can demonstrate cause for and prejudice from the default or that a fundamental miscarriage of justice will occur if the court fails to address the claim's merits. *See, e.g., Woods v. Scwartz*, 589 F.3d 368, 373 (7th Cir. 2009). A fundamental miscarriage of justice occurs when a petitioner presents a compelling claim of actual innocence. *House v. Bell*, 547 U.S. 518, 536–37 (2006). To do this, "the petitioner must show that "in light of new evidence, it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Id.* at 537.

If the habeas corpus petitioner presented his claims in state court and the state court adjudicated the claims on their merits, the applicable statute nevertheless precludes relief unless the state court's decision: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

## A.    Involuntary intoxication defense

The parties agree that Mertz procedurally defaulted his claim that trial counsel was unconstitutionally ineffective for failing to assert Mertz's involuntary intoxication as an affirmative defense to the crime during the guilt phase of his trial.  Mertz does not argue cause and prejudice to excuse the default.  The Court can therefore reach the merits of his claim only if it concludes that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt in the light of the new evidence he has presented, not offered at trial, regarding his involuntary intoxication. *See Britz v. Cowan*, 192 F.3d 1101, 1103 (7th Cir. 1999) (actual innocence exception to procedural default applies to habeas petitioners whose innocence is based on an affirmative defense).

Mertz has provided the following evidence, not introduced at his trial,  in support of his claim that he was involuntarily intoxicated when he murdered McNamara on June 12, 2001:  (1) medical and jail records documenting a suicide attempt on January 7, 2001, shortly after he was arrested for driving under the influence and driving with a revoked license; (2) medical records from the Veterans Administration Medical Center reflecting that Mertz filled a prescription for two antidepressants the day before the crime; (3) a report by a psychiatrist, Dr. John Franklin, opining that Mertz suffers from severe alcohol dependence and concluding that he conceivably may be susceptible to violent episodes as a result of combining anti-depressants with alcohol; and (4) documents relating to Mertz's family, including court documents that describe Mertz's uncle as a "dangerous, unprincipled and mentally disturbed individual."  Ex. J at C. Supp. 837.

At the time of Mertz's trial, Illinois courts, including the Illinois Supreme Court, had concluded that the defense of involuntary intoxication, as embodied in a state statute, required "intoxication induced by some external influence such a trick, artifice or force." *People v. Rogers*, 123 Ill. 2d 487, 508, 528 N.E.2d 667, 677 (1988); *see* 420 ILCS 5/6-3.  Mertz would not have been able to satisfy that standard; he makes no claim that he was intoxicated due to an external influence of that sort.

Mertz's appeal, however, was not decided until 2006.  In January of that year, the Illinois Supreme Court overruled *Rogers* and concluded that the statutory defense of involuntary intoxication includes "intoxication resulting from the unexpected and unwarned adverse side effects of medication prescribed by a physician . . . ." *People v. Hari*, 218 Ill. 2d 275, 291, 843 N.E.2d 349, 359 (2006).  And as the court indicated in *Hari*, when the defendant offers evidence sufficient to present a defense of involuntary intoxication, the prosecution must disprove the defense beyond a reasonable doubt. *Id.* at 295, 843 N.E.2d at 361.  The Court thus will consider Mertz's actual innocence claim under the post-*Hari* state of Illinois law.

In *Hari*, the court determined that the defendant had produced evidence that he may have been involuntarily intoxicated when he committed his crimes:  he had an unexpected reaction to a combination of Tylenol PM and the Zoloft he had been prescribed six days earlier, and the reaction was one about which neither the doctor nor the information provided with the Zoloft itself had warned.  *Id.* at 288–89, 843 N.E.2d at 357.  The court concluded that if the jury believed Hari's evidence and found that his reaction rendered him unable to "appreciate the criminality of his acts or conform his conduct to the requirements of the law," he could prevail at trial.  *Id.* at 296, 843 N.E.2d

at 361.

The evidence that Mertz has provided, however, does not give rise to a viable involuntary intoxication defense such that no reasonable jury would have found him guilty at trial. Mertz's medical records reflect that he filled prescriptions for Paroxetine and Trazodone, two anti-depressants, the day before he killed McNamara. Ex. J at C. Supp. 540. Yet this same document shows that he had been filling prescriptions for the same quantity of both medications since at least January 23, 2001. Unlike in *Hari*, where the defendant had only begun taking the medications six days earlier, Mertz had been taking the drugs for nearly six months. And Mertz does not argue that he was not consuming alcohol during this extended period. To the contrary, the expert whose report he submitted in support of his claim concluded that Mertz had a severe dependence on alcohol with evidence of "[e]arly and consistent blackouts . . . ." *Id.* at C250. Thus any intoxication that might have resulted from the combination of the anti-depressants and alcohol was not unexpected such that it could be considered to have been produced involuntarily, as Illinois law requires.

The other evidence Mertz offers does not carry him across the threshold required to excuse his procedural default. Franklin's report does not address Mertz's state of mind on June 12, 2001 when he killed McNamara. Franklin opines only that Mertz has "significant alcohol problems" and that "[i]t is *conceivable* that Mr. Mertz is especially susceptible to episodic violent acts due to the combination of his genetic make-up, high dose SSRI medication . . . , history of brain trauma and acute intoxication." *Id* at C250–51 (emphasis added). Mertz has not submitted any report or analysis to the effect that he was so intoxicated when he committed the murder that he could not appreciate the

criminality of his acts or could not conform his conduct to the requirements of the law. Franklin's opinion that it is possible that he was intoxicated is insufficient. Similarly, Mertz's evidence regarding his uncle's possible mental illness and his own past suicide attempts may suggest an underlying psychiatric condition or personality disorder, but this evidence does not support a contention that he was involuntarily intoxicated on the night of the murder.

In sum, Mertz has not produced evidence sufficient to show that it is more likely than not that no reasonable juror would have convicted him of his crimes based on a defense that he was involuntarily intoxicated on June 12, 2001. As such, he cannot excuse his procedural default. The Court therefore does not address the merits of his claim that trial counsel was ineffective for failing to introduce evidence of his intoxication as an affirmative defense during the guilt phase of his trial. *See, e.g., Lewis v. Sternes*, 390 F.3d 1019, 1026–27 (7th Cir. 2004).

Mertz did, however, present to the state courts his claim that trial counsel was unconstitutionally ineffective in connection with the sentencing phase of the trial for failing to investigate and produce evidence of Mertz's mental state for purposes of mitigation. Accordingly, the Court may address this portion of the claim on its merits. Mertz also raises three additional grounds for trial counsel's ineffectiveness in connection with sentencing. The Court will address all four points together.

**B.    Trial counsel's assistance at sentencing**

Mertz contends that his trial counsel rendered unconstitutionally ineffective assistance at his sentencing by : (1) failing to investigate and produce evidence of Mertz's intoxication at the time of the murder as mitigating evidence, (2) failing to

investigate and produce evidence challenging his involvement in Warner's murder, (3)

failing to investigate and produce evidence challenging his involvement in the Unique

Apartments arson, and (4) failing to attack the admissibility of the testimony of Joe

Siefferman, the crime scene investigator who testified about the similarities between the

Warner's and McNamara's murder.  Mertz also contends that his appellate counsel, who

did not make an argument concerning trial counsel's performance regarding

Siefferman's testimony, rendered unconstitutionally ineffective assistance.

Mertz no longer faces a death sentence.  That does not, however, render his

sentencing-related claims moot; the trial judge had the authority to impose a sentence

shorter than his current sentence of life without parole.  *Simpson v. Battaglia*, 458 F.3d

585, 595 (7th Cir. 2006); *Madej v. Briley*, 371 F.3d 898, 899 (7th Cir. 2004) ("A full

remedy for [a] constitutional shortcoming at the original sentencing hearing entails

allowing [a petitioner] to seek that lower sentence now.").

### 1.     Application of section 2254(d)

The only state court to address the merits of Mertz's ineffective-assistance claims

was the trial court – specifically, the Coles County Circuit Court – when it dismissed

Mertz's post-conviction petition.  As noted above, the Illinois Appellate Court dismissed

Mertz's subsequent appeal of the trial court's decision on the ground that it was moot.

The court based this determination on Governor Quinn's commutation of Mertz's death

sentence to a sentence of life without the possibility of parole.  This, the appellate court

concluded, left Mertz without a judicially-imposed sentence, thus rendering moot his

claims at the sentencing phase of his court case.

The first question is how section 2254(d)(2) applies to Mertz's sentencing-related

ineffective assistance of counsel claims – more specifically, whether this court is reviewing a state court decision for unreasonableness or is assessing Mertz's claims *de novo*.  Respondent argues that the unreasonableness standard applies despite the fact that the appellate court did not address Mertz's claims on their merits.  Respondent contends that the effect of the appellate court's mootness decision, for present purposes, is that this Court should look to the last court that *did* review Mertz's claims on their merits, namely the trial court in its consideration of Mertz's post-conviction petition.  Respondent states, in a conclusory manner without citation to any case law, that the appellate court's "dismissal on the basis of mootness did not deprive the state trial court's adjudication of preclusive effect."  Resp.'s Answer at 44 n.3.  The Court's own review of the law leads it to the conclusion that respondent's position is incorrect.

To qualify as an adjudication on the merits, the state court's resolution of a petitioner's claims must be a merits-based resolution that has preclusive effect, in contrast to, for example, a waiver or forfeiture-based ruling, or a ruling by a lower or intermediate court that was not the state courts' final resolution of the claim.  *Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009); *Richardson v. Hardy*, 855 F. Supp. 2d 809, 828 (N.D. Ill. 2012) (Kennelly, J.).  Thus if the last state court to address the petitioner's federal constitutional claim decided the claim on grounds other than its merits and, in doing so, displaced or vacated a lower court's merits resolution, there has been no adjudication on the merits in state court, and subsection 2254(d) does not apply.  In policy terms, there is no insult to federal-state comity if a federal court does not give deference to a decision of a lower state court that has been superseded by a higher state court's decision in the same case.  Thus the question is whether the Illinois

Appellate Court's determination that Mertz's post-conviction appeal was moot deprives the Coles County Circuit Court's decision on the merits of preclusive effect.

The United States Supreme Court, in *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950), noted that as a matter of federal common law, when a case becomes moot pending appellate review before the appellate court can render a decision on the merits, "[t]he established practice . . . is to reverse or vacate the judgment below and remand with a direction to dismiss." *Munsingwear*, 340 U.S. at 39. The Court reasoned that vacating the lower court's decision preserves the rights of all parties and allows for future relitigation of issues that were denied appellate review "through happenstance." *Id.* at 40. In other words, as a matter of federal law, a mootness determination on appeal deprives the lower court's decision of preclusive effect.

The Illinois Supreme Court has adopted the federal common-law rule. *Felzak v. Hruby*, 226 Ill. 2d 382, 394, 876 N.E.2d 650, 658 (2007) (citing *Munsingwear*, 340 U.S. at 39–40). In *Felzak*, the court noted that because it concluded the party's appeal was moot, the court would not reach the merits of the lower court's decision and could not "speak to the correctness of the judgments rendered by the circuit and appellate courts in this matter." *Id.* Thus, "[t]o prevent the appellate court's resolution of the issues presented to it from standing as precedent for future cases," the court vacated the decisions of both courts below. *Id.*; *see also George W. Kennedy Constr. Co. v. City of Chi.*, 112 Ill. 2d 70, 78, 491 N.E.2d 1160, 1163 (1986); *People ex rel. Black v. Dukes*, 96 Ill. 2d 273, 278, 449 N.E.2d 856, 858 (1983). In sum, in Illinois, as in federal common law, a ruling by an appellate court that a case is moot deprives the lower court's decision on the merits of preclusive effect. The limitation on federal review provided by

section 2254(d) thus does not apply to the trial court's decision on Mertz's post-conviction petition. The Court therefore addresses *de novo* Mertz's claims of ineffective assistance of counsel at the sentencing phase of his trial.

####    2.    The merits

To prevail on a claim of ineffective assistance of counsel under the Sixth Amendment, a petitioner must show both that counsel's performance fell below an objective standard of reasonableness and that the petitioner suffered prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 668, 694 (1984). The Supreme Court stated in *Strickland* that courts should "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks omitted); *see also Bell v. Cone*, 535 U.S. 585, 702 (2002) (strong presumption warranted because "it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight"). On the question of prejudice, it is insufficient for the petitioner to establish only that "the errors had some conceivable effect on the outcome." *Harrington v. Richter*, 131 S. Ct. 770, 787 (2011) (citing *Strickland*, 466 U.S. at 693). Instead, a petitioner must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In the sentencing context, the court must determine whether there is a reasonable probability that the petitioner would have received a shorter sentence (in this case, shorter than the life-without-parole sentence Mertz is now serving) had his counsel rendered constitutionally

effective assistance.  *See Lafler v. Cooper*, 132 S. Ct. 1376, 1386 (2012); *Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

Respondent argues that even if counsel's failures fell below an objective standard of reasonable representation, the aggravating evidence against Mertz was so overwhelming that no reasonable sentencing judge could have imposed a sentence less than life without parole.  The Court agrees.  The prosecution presented exhaustive testimony by several witnesses discussing Mertz's predilection for violence and long history of violence against women.  A number of Mertz's ex-girlfriends testified that Mertz raped them.  Several officers from the Coles County jail testified regarding Mertz's continued violence even while he was incarcerated pending trial.  Mertz's cellmate, Michael Jordan, testified about Mertz's plans for violence in the future and his plans to escape prison.

More importantly, the crime for which Mertz was on trial itself was particularly violent and disturbing.  Mertz broke into McNamara's apartment through an open window, killed McNamara by shoving a wash rag deep into her throat and choking her manually, sliced open her stomach so deeply that her intestines were visible, stabbed her in several other locations, including her genitals, and then dragged her body to the front door for her roommate to discover when she arrived home.  His admission to his cellmate that he had first tried to enter through the front door and his use of latex gloves indicated that the attack was calculated.

Even if the trial judge, in sentencing Mertz to a prison term, were to disregard all of the evidence concerning the Warner murder and the Unique Apartments arson, there is simply no reasonable possibility that Mertz would have received a term-of-years

sentence rather than life without parole. In any event, some of the strongest evidence about the Warner murder and Unique Apartments arson came from Mertz himself, via his admissions to neighbors and friends that he committed the crimes. Although his friends and neighbors testified that they all considered Mertz to be joking when he made these admissions, it is highly likely that even without the arguably objectionable evidence about these events, the sentencing judge would have believed Mertz's admissions to be true. The Court concludes that even if trial counsel's representation at Mertz's sentencing fell below an objective standard of reasonableness—a topic the Court does not address—there is no reasonable probability that Mertz would have received a sentence less than life in prison without the possibility of parole. *Wong*, 558 U.S. at 19–20. Thus Mertz cannot prevail on his claims that trial counsel was unconstitutionally ineffective.

Finally, because any alleged ineffective assistance by trial counsel did not prejudice Mertz, his appellate counsel's failure to assert trial counsel's ineffectiveness likewise did not prejudice Mertz in the sense required by *Strickland*.

## C. Wright's profiling testimony

Mertz next contends that the trial court violated his right to due process when it allowed James Wright to testify about his "psychological analysis" of Mertz in support of the prosecution's allegations that he killed Warner and committed the Unique Apartments arson. The Illinois Supreme Court reached the merits of this claim when it affirmed his conviction on direct appeal. Thus the Court can grant Mertz relief on the claim only if the Illinois Supreme Court's decision was contrary to or an unreasonable application of United States Supreme Court precedent.

There is no United States Supreme Court precedent that establishes when testimony is so unreliable that its admission runs afoul of the Due Process Clause of the Fourteenth Amendment. Thus the state court's decision was not "contrary to" United States Supreme Court precedent. The only federal constitutional principle upon which Mertz may rely is the proposition that when "evidence is introduced that is so unduly prejudicial, it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991).

Though the Illinois Supreme Court did not expressly apply this standard, it assessed Mertz's claim in terms of whether he was harmed by the admission of Wright's testimony. Specifically, the court found that Wright's testimony was cumulative of testimony given by other witnesses, and the opinions that he offered were commonsense, obvious conclusions that the jurors could have made themselves. It concluded that any error in the admission of the testimony was "harmless beyond a reasonable doubt." *Mertz*, 218 Ill. 2d at 74, 842 N.E.2d at 658. This was the equivalent of a finding that the admission of the testimony was not unduly prejudicial. The court discussed at length each point that Wright addressed in his testimony, and it identified the other witnesses whose testimony duplicated his. The state court made a fair assessment of this evidence, and it was reasonable for the court to conclude that Wright's testimony added little of significance to the evidence in aggravation.

In addition, Wright's testimony that Mertz's crimes suggested that he had "a lot of anger toward women," *id.* at 71, 842 N.E.2d at 656, was cumulative of the testimony by a number of women not only that he was angry and aggressive toward them, but that he

raped and physically abused them. Given this evidence, the Illinois Supreme Court reasonably concluded that even without Wright's testimony, this "characteristic of [Mertz's] personality was obvious to the jury." *Id.* at 76, 842 N.E.2d at 659.

In sum, the Court concludes that the Illinois Supreme Court's decision rejecting Mertz's claim in this regard was neither contrary to nor an unreasonable application of clearly established federal law.

**D.    First Amendment issues**

The Illinois Supreme Court also reached the merits of Mertz's First Amendment claim on direct appeal. The court correctly identified the relevant Supreme Court decision, *Dawson*, in deciding Mertz's claim. The court also applied *Dawson* reasonably in assessing the evidence that Mertz claimed was admitted in error.

The United States Supreme Court ruled in *Dawson* that "the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and assocations at sentencing simply because those beliefs and associations are protected by the First Amendment." *Dawson*, 503 U.S. at 165. The Court held, however, that the First Amendment does prevent a state "from employing evidence of a defendant's abstract beliefs at a sentencing hearing when those beliefs have no bearing on the issue being tried." *Id.* at 168. Thus the Constitution allows for the admission at a sentencing hearing of evidence within the First Amendment's protection if it is relevant to the issues being considered at the sentencing.

Mertz complains about admission of the following evidence or testimony: (1) his interest in the execution of Timothy McVeigh, (2) his opposition to the death penalty, (3) his sympathy for those involved in the Waco and Ruby Ridge incidents, (4) testimony

that he admitted having respect for Hitler, (5) various articles and Internet sites on the topics of racism and "White Pride," (6) six articles on date rape found on his computer, (7) temporary Internet files on the computer involving pornography, including child pornography and photographs depicting bestiality, (8) Mertz's tattoos, including a tattoo of the "Grim Reaper" and a tattoo of a cross with flames and skulls around it, (8) nude photographs of two previous girlfriends, (9) Mertz's e-mail address using the handle "Cereal Kilr 2000," and (10) books that Mertz owned on Hitler, Nazism, and anarchism.

The Illinois Supreme Court reasonably determined that all of the sexually explicit material was properly admitted for the jury to consider in conjunction with the other evidence of Mertz's violent sexual conduct and that because the McNamara murder itself had a sexual component, the evidence was relevant to his future dangerousness. As the state court stated, "[t]he relevance of this evidence is obvious." *Mertz*, 218 Ill. 2d at 63, 842 N.E.2d at 652. The court likewise reasonably determined that evidence regarding Mertz's "Cereal Kilr 2000" Internet handle and his tattoos were admissible. The fact that Mertz chose an e-mail address by which he appeared to describe himself as a serial killer and the fact that he chose two tattoos with violent imagery reasonably could assist a sentencer in deciding whether Mertz had any remorse about killing McNamara, or whether he was "fixated upon violence, death and killing, . . . thus represent[ing] a continuing threat to those around him." *Id.* at 65, 842 N.E.2d at 653.

The Illinois Supreme Court likewise did not unreasonably apply *Dawson* when it determined that the books Mertz owned on Hitler, Nazism, and anarchism were admissible. The state court reasoned that his copy of *Mein Kampf*, when linked to Mertz's comment that he approved of Hitler's efforts to "purify his race," tended to

establish that he endorsed genocide, which reasonably bore on the issue of his future

dangerousness. The court found that the books relating to anarchism, including *The*

*Anarchist's Cookbook* and *Pipe and Fire Bomb Designs*, were relevant regarding

whether he committed the Unique Apartments arson. The Court agrees that *Dawson*

does not foreclose admission of this evidence. In *Dawson*, the Supreme Court found it

improper to admit evidence that the defendant belonged to the Aryan Brotherhood

because the prosecution had not introduced any evidence that the group committed any

unlawful or violent acts, and the defendant's membership alone did not therefore tend to

show anything other than that the defendant belonged to a group with a bad reputation.

*Dawson*, 503 U.S. at 166. In Mertz's case, however, Hitler's violent and unlawful

activities are well documented, and the books on bomb-making patently involved

violence.

This Court agrees with the Illinois Supreme Court's determination that Mertz's

interest in Timothy McVeigh and other antigovernment groups and his opposition to the

death penalty were not relevant for any proper sentencing purpose. Yet as the state

court reasonably concluded, admission of evidence documenting those beliefs was

harmless, given the other aggravating evidence introduced against Mertz at his

sentencing hearing. The state court therefore acted reasonably when it overruled

Mertz's claim despite this error.

In sum, Mertz is not entitled to relief based on the trial court's admission of

evidence regarding his beliefs or associations.

**E.      Certificate of appealability**

When a district court enters a final judgment that dismisses a prisoner's habeas

corpus petition, it must issue or deny a certificate of appealability (COA). The court of appeals lacks jurisdiction to rule on the merits of a habeas corpus petitioner's appeal unless a COA is issued. *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). To obtain a COA, the petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A court should issue a COA if it determines that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted). When a district court has denied a habeas corpus petitioner's claim on procedural grounds, to obtain a COA the petitioner must show that reasonable jurists would find the claim fairly debatable on its merits and would also find the procedural ruling debatable. *Id.* at 478.

The Court declines to issue a COA on Mertz's ineffective assistance claim regarding trial counsel's failure to present an intoxication defense at the guilt phase, because the procedural ruling (that the claim was defaulted and the "actual innocence" exception does not apply) is not fairly debatable among reasonable jurists. The Court issues a COA on Mertz's remaining claims, because although the Court has rejected those claims they are, in the Court's view, fairly debatable.

## Conclusion

For the reasons stated above, the Court denies the petition for a writ of habeas corpus. The Court issues a certificate of appealability on the claims identified in the petition as claims 1 (but only as to the sentencing phase aspect of the claim) and claims

2 through 6.  The Court directs the Clerk to enter judgment in favor of the respondent.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  September 13, 2013